**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| IN RE PRESS APPLICATION FOR ACCESS TO JUDICIAL RECORDS AND PROCEEDINGS ANCILLARY TO CERTAIN GRAND JURY PROCEEDINGS CONCERNING DONALD J. TRUMP AND THE TRUMP ORGANIZATION |

Case: 1:22-mc-00128
Assigned to: Chief Beryl A. Howell
Assign Date: 12/15/2022
Description: Misc
Chief Judge Beryl A. Howell

Hearing Requested

**PRESS APPLICATION FOR ACCESS TO JUDICIAL RECORDS AND**
**PROCEEDINGS ANCILLARY TO CERTAIN GRAND JURY PROCEEDINGS**
**<u>CONCERNING DONALD J. TRUMP AND THE TRUMP ORGANIZATION</u>**

Pursuant to Local Criminal Rules 57.6 and 6.1, CBS Broadcasting Inc. o/b/o CBS News, American Broadcasting Companies, Inc. d/b/a ABC News, The Associated Press, Bloomberg L.P., Cable News Network, Inc., Dow Jones & Company, Inc., publisher of The Wall Street Journal, The E.W. Scripps Company, Gannett Co., Inc., Gray Media Group, Inc., Los Angeles Times Communications LLC, National Public Radio, Inc., NBCUniversal Media, LLC d/b/a NBC News, The New York Times Company, POLITICO LLC, Pro Publica, Inc., and WP Company LLC, d/b/a The Washington Post (together, the "Press Coalition") respectfully move the Court for access to certain judicial records pertaining to the grand jury subpoena issued to the Custodian of Records for the Office of Donald J. Trump on May 11, 2022.  Specifically, the Press Coalition seeks access to all motions, memoranda, exhibits, opinions, orders, hearings, hearing transcripts, and other judicial records related to the Government's request to hold former President Trump or his representatives in contempt with regard to the response to that subpoena.

The Press Coalition recognizes that Federal Rule of Criminal Procedure 6(e) ordinarily restricts the disclosure of "a matter occurring before the grand jury," and that Local Criminal Rule 6.1 provides for the filing under seal of all motions and associated papers and orders

prepared "in connection with a grand jury subpoena or other matter occurring before a grand jury[.]"  The Local Rule, however, also provides that records of such proceedings "may be made public by the Court on its own motion or on motion of any person upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury[.]"

The Court, the Government, and the subject of these grand jury proceedings – former President Trump – all have acknowledged the existence of this extraordinary grand jury proceeding and this particular subpoena.  The Government, the former President, and the courts have discussed the subpoena in detail in public court records, and the Government's contempt motion has been the subject of significant news reporting, including by members of this Press Coalition.  Under the unique, unprecedented, and historic circumstances of this case, "continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury[.]"  Moreover, transparency is essential to maintaining public confidence in our system of justice when the Government calls into serious question the lawfulness of a former President's conduct.

The Court should therefore provide access to these judicial records with only those narrow redactions necessary to shield whatever factual material, if any, might still require protection from disclosure under Federal Criminal Rule 6(e) and Local Criminal Rule 6.1.

For the reasons set forth more fully in the accompanying Memorandum of Points and Authorities, the Press Coalition respectfully requests that the Court grant this application and unseal the requested materials.  The Press Coalition further requests a hearing on this application.

Dated:  December 15, 2022            Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Chad R. Bowman (#484150)
1909 K Street, NW, 12th Floor

Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
bowmanchad@ballardspahr.com

*Counsel for the Press Coalition*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE PRESS APPLICATION FOR ACCESS TO JUDICIAL RECORDS AND PROCEEDINGS ANCILLARY TO CERTAIN GRAND JURY PROCEEDINGS CONCERNING DONALD J. TRUMP AND THE TRUMP ORGANIZATION | Case No. _____ <br><br> Chief Judge Beryl A. Howell <br><br> Hearing Requested |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PRESS APPLICATION FOR ACCESS TO JUDICIAL RECORDS AND PROCEEDINGS
ANCILLARY TO CERTAIN GRAND JURY PROCEEDINGS CONCERNING
<u>DONALD J. TRUMP AND THE TRUMP ORGANIZATION</u>**

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Chad R. Bowman (#484150)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
bowmanchad@ballardspahr.com

*Counsel for the Press Coalition*

## PRELIMINARY STATEMENT

In this Application, several news organizations (the "Press Coalition") seek access to judicial records concerning the Government's extraordinary request that this Court hold former President Donald J. Trump and/or his representatives in contempt for their responses to a grand jury subpoena seeking materials bearing classification markings that Trump retained after leaving the White House.

These judicial records take on even greater importance as Trump is now the subject of a Special Counsel investigation and, at the same time, has declared his intention to run for President again in 2024.  The public interest in the Department of Justice's rationale in seeking to hold the former President in contempt, and the Court's careful consideration of this issue – at the very moment Trump asks to return to the White House – could not be greater.

Moreover, there is no longer any reason to keep these records secret.  It is already a matter of record, set out in public court files and elsewhere, that Trump received the grand jury subpoena (the "Subpoena") in May 2022, months before the FBI executed a search warrant at Mar-a-Lago.  With this Court's express permission, the public has seen the Subpoena itself, a letter concerning the Subpoena that the Justice Department sent to Trump's counsel, and a certification signed by the Custodian of Records for Trump's Office describing the initial search for records responsive to the Subpoena.  *See* Order, *In re Application of USA for Order Pursuant to Fed. R. Crim. P. 6(E)(3)(E)(I) for Limited Disclosure of Matter Occurring Before a Grand Jury*, No. 22-GJ-37 (D.D.C. Aug. 29, 2022) (Howell, C.J.) at 2 (authorizing the Government "to discuss" the Subpoena "as well as any correspondence or communications directly flowing from that [S]ubpoena" in "filings and at any hearing" in connection with Trump's collateral litigation over the Mar-a-Lago search).

Last week, the Court denied the press and public access to a hearing on the Government's contempt motion.  The Press Coalition now seeks to unseal a transcript of that hearing, any other hearing the Court has held on the contempt issue, the Government's contempt motion and any prior motion to compel, any briefing on those motions and all exhibits thereto, and any opinions or orders the Court has issued regarding that motion or the contempt issue generally, and respectfully requests an opportunity to be heard in advance of future sealed proceedings.  This request is expressly authorized under Local Criminal Rule 6.1 and the controlling case law of this Circuit, which holds that "when once-secret grand jury material becomes sufficiently widely known, it may lose its character as Rule 6(e) material."  *In re Grand Jury Proceedings (Miller)*, 493 F.3d 152, 154 (D.C. Cir. 2007) (citation and internal marks omitted).

This Court has discretion under Local Criminal Rule 6.1 to unseal the requested records "upon a finding that continued secrecy is not necessary to prevent disclosure of matters occurring before the grand jury."  L. Crim. R. 6.1.  And "where the Rules authorize [courts] to do so, [courts] may – *and should* – release any information so long as it does not reveal the 'identities of witnesses or jurors, the substance of testimony' as well as actual transcripts, 'the strategy or direction of the investigation, the deliberations or questions of jurors, and the like.'"  Order, *In re Grand Jury Subpoena*, No. 18-3071 (D.C. Cir. Apr. 23, 2019) (per curiam) at 1 (emphasis added) (quoting *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499-500 (D.C. Cir. 1998)).

Given the profound interest in these judicial records, the extensive public judicial disclosure of the events at issue, and the gravity of a request by the Government to hold a former President and current presidential candidate in contempt, the Press Coalition respectfully requests that the Court unseal redacted versions of any judicial records related to this contempt dispute.

## RELEVANT PUBLIC BACKGROUND

### A.    The FBI's Search of Mar-A-Lago

On the morning of August 9, 2022, former President Trump announced to the world that

his Florida home, Mar-a-Lago, had been "raided, and occupied by a large group of FBI agents."

*See, e.g.*, Caroline Linton, *Trump says Mar-a-Lago was "raided" by FBI*, CBS News (Aug. 9,

2022), https://www.cbsnews.com/news/donald-trump-mar-a-lago-fbi-search-warrant-raid/.

Within days, the press began reporting that the search related to a grand jury subpoena that

Trump had received in the spring of 2022.  *See, e.g.*, John Santucci et al., *Trump received*

*subpoena in spring for documents not turned over: Sources*, ABC News (Aug. 11, 2022),

https://abcnews.go.com/Politics/donald-trump-received-subpoena-spring-documents-turned-

investigators/story?id=88252177; Devlin Barrett et al., *FBI searched Trump's home to look for*

*nuclear documents and other items, sources say*, The Washington Post (Aug. 12, 2022),

https://www.washingtonpost.com/national-security/2022/08/11/garland-trump-mar-a-lago/.

Also within days, the press and public began seeking access in the U.S. District Court for

the Southern District of Florida to records related to the Government's search warrant.  On

August 22, 2022, the U.S. Magistrate Judge who had approved the warrant granted a motion,

filed by the undersigned on behalf of many of the news organizations in this Coalition, to release

a redacted copy of the search warrant affidavit.  *In re Sealed Search Warrant*, --- F. Supp. 3d ---,

2022 WL 3582450 (S.D. Fla. Aug. 22, 2022).  In granting access to the warrant materials, the

court recognized the "foundational principle of American law that judicial proceedings should be

open to the public."  *Id.* at *2.  The court also acknowledged the line of cases, which largely

"arise in the grand jury setting," that address the Government's interests in secrecy while

investigations remain pending, *id.* at *3, but the court concluded that, "given the intense public

and historical interest in an unprecedented search of a former President's residence, the Government has not yet shown that [its] concerns are sufficient to justify sealing," *id.* at *5.

>    **B.    Trump Discloses the Subpoena**

Trump has continued to reveal information about the investigation in proceeding after proceeding.  On August 22, 2022, as part of his request for the appointment of a Special Master to oversee the Government's use of the materials it seized from Mar-a-Lago, Trump disclosed in a public court filing that he had accepted service of the Subpoena for "documents bearing classification markings" on May 11, 2022.  *See* Mot. for Jud. Oversight & Additional Relief, *Trump v. United States*, No. 9:22-cv-81294-AMC (S.D. Fla. Aug. 22, 2022) (ECF No. 1) at 5. Trump claimed that he had personally "determined that a search for documents bearing classification markings should be conducted – even if the marked documents had been declassified – and his staff conducted a diligent search of the boxes that had been moved from the White House to Florida."  *Id.*  Trump further claimed that, through counsel, he had "invited the FBI to come to Mar-a-Lago to retrieve responsive documents."  *Id.*  Trump's filing provided additional details about his discussions with the Department of Justice and the FBI about the Subpoena, and it also revealed that "[a]t President Trump's direction," the Custodian of Records for the Trump Organization accepted service of another grand jury subpoena "seeking footage from surveillance cameras at Mar-a-Lago."  *Id.* at 5-6.

>    **C.    The Government Officially Acknowledges and Discusses the Subpoena**

As Trump has publicly revealed information about the investigation, the Government has responded by revealing even more information.  In opposing Trump's request for a Special Master on August 30, 2022, the Government divulged that it had sought and received permission from this Court "to disclose . . . these grand jury subpoenas and material discussed therein."  *See*

United States' Resp. to Mot. for Jud. Oversight & Additional Relief ("U.S. Resp."), *Trump v. United States*, No. 22-cv-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 48) at 7 n.2.  The Government explained that the grand jury issued the Subpoena after the National Archives and Records Administration made a referral to the Justice Department having located "evidence that classified records had been stored at [Mar-a-Lago] until mid-January 2022."  *Id.* at 5.  The Government further revealed that the Department of Justice subsequently sought access to certain boxes of records at Mar-a-Lago and obtained such access in May 2022.  *Id.* at 6-7.  That disclosure also included the information that in the same month, the Department of Justice obtained the Subpoena, which "was directed to the custodian of records for the Office of Donald J. Trump" and sought "[a]ny and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings."  *Id.* at 7-8.

In fact, the Government did not just describe the grand jury's Subpoena.  It placed a copy of the Subpoena itself – marked "Subpoena #GJ2022042790054" and labeled "SUBPOENA TO TESTIFY BEFORE A GRAND JURY" – on the public docket as an attachment to its response:

*Id.* Att. C (ECF No. 48-1) at 11.  The Subpoena was signed by Jay I. Bratt, Chief of the Justice

Department's Counterintelligence and Export Control Section.  *Id.*  The Government also

docketed a letter that Section Chief Bratt sent to Trump's counsel confirming that the custodian

of Trump's records could "comply with the [S]ubpoena by providing any responsive documents

to the FBI at the place of their location" and by "provid[ing] a sworn certification that the

documents represent all responsive records."  *Id.* Att. D (ECF No. 48-1) at 14.

The Government's filing further described its negotiations with Trump over the deadline

for responding to the Subpoena and how "three FBI agents and a DOJ attorney" traveled to Mar-

a-Lago to retrieve the responsive documents.  *See* U.S. Resp. at 8.  The Government revealed

that Trump's custodian of records, later reported to be attorney Christina Bobb, "produced and

provided a signed certification letter" that described the search conducted for responsive records,

*see id.* at 9, and the Government placed a copy of that certification letter on the public docket as

well, *see id.* Att. E (ECF No. 48-1) at 16.  The Government then detailed what Trump's counsel

represented as to where the responsive records had been located.  *See* U.S. Resp. at 9.

The Government subsequently described the records that Trump had produced in

response to the Subpoena, namely "38 unique documents bearing classification markings,

including 5 documents marked as CONFIDENTIAL, 16 documents marked as SECRET, and 17

documents marked as TOP SECRET," and it noted that "FBI agents observed markings

reflecting sensitive compartments and dissemination controls."  *Id.* at 10.  The Government then

stated that it "uncovered multiple sources of evidence indicating that the response to the

[Subpoena] was incomplete and that classified documents remained at the Premises,

notwithstanding the sworn certification made to the government on June 3."  *Id.*  In a subsequent

filing, the Government confirmed that it "is investigating the adequacy of the response" to the

Subpoena.  *See* United States' Mot. for Partial Stay Pending Appeal, *Trump v. United States*, No. 22-cv-81294-AMC (S.D. Fla. Sept. 8, 2022) (ECF No. 69) at 9.

### D.      More Information about the Subpoena Comes to Light

In the months after the Government officially acknowledged the Subpoena, the public continued to learn about how Trump and his representatives responded to it:

•      On October 12, 2022, press reports revealed that after Trump received the Subpoena, he "told people to move boxes to his residence at [Mar-a-Lago]," and that this account "was corroborated by the security-camera footage."  *See* Devlin Barrett & Josh Dawsey, *Trump worker told FBI about moving Mar-a-Lago boxes on ex-president's orders*, The Washington Post (Oct. 12, 2022), https://www.washingtonpost.com/national-security/2022/10/12/maralago-witness-trump-boxes-moved/.

•      On October 19, 2022, the public learned that Trump was considering "whether to allow federal agents to return to [Mar-a-Lago], and potentially conduct a supervised search, to satisfy the Justice Department's demands that all sensitive government documents are returned," after the Government "made clear that it believes Trump failed to comply with [the Subpoena] ordering the return of all documents marked as classified and that more government records remain missing."  *See* Sara Murray et al., *EXCLUSIVE: Trump considers allowing federal investigators to search Mar-a-Lago again*, CNN (Oct. 19, 2022), https://www.cnn.com/2022/10/19/politics/trump-mar-a-lago-second-search/index.html.

•      On November 18, 2022, Attorney General Merrick B. Garland appointed John L. "Jack" Smith to serve as Special Counsel for the Department of Justice, and in that capacity "to conduct the ongoing investigation referenced and described in" the Government's response to Trump's request for a Special Master, "as well as any matters that arose or may arise directly

from this investigation."  *See* Off. of the Att'y Gen., Order No. 5559-2022, *Appointment of John L. Smith as Special Counsel* (Nov. 18, 2022), https://www.justice.gov/opa/press-release/file/1552896/download.  Special Counsel Smith thus took charge of the investigation into 'classified documents and other presidential records, as well as the possible obstruction of that investigation.'"  *See* Kathryn Watson & Robert Legare, *Garland names special counsel to oversee Trump documents case, aspects of Jan. 6 probe*, CBS News (Nov. 18, 2022), https://www.cbsnews.com/news/special-counsel-trump-investigations-merrick-garland/.  The Government's request that this Court "hold Trump in contempt for failing to comply with a subpoena ordering him to turn over records marked classified" is one of "a series of high-profile moves" that Special Counsel Smith has made "since he was put in charge."  *See* Katelyn Polantz et al., *Special Counsel Smith speeds ahead on criminal probes surrounding Trump*, CNN (Dec. 11, 2022), https://www.cnn.com/2022/12/11/politics/jack-smith-special-counsel-high-profile-moves-trump-criminal-investigations/index.html.

• On December 7, 2022, press organizations reported that Trump's lawyers had hired an "outside team" to search his properties for additional items with classified markings, and that this team had located "at least two items marked classified" at "a storage unit in West Palm Beach" that was "used by the former president."  *See* Jacqueline Alemany et al*., Items with classified markings found at Trump storage unit in Florida*, The Washington Post (Dec. 7, 2022), https://www.washingtonpost.com/nation/2022/12/07/trump-tower-bedminster-records-search/.  These supplemental searches took place "after Trump's legal team was pressed by a federal judge to attest that it had fully complied with [the Subpoena] to turn over all materials bearing classified markings."  *Id.*  The dispute was part "a lengthy and fierce battle between Trump's attorneys and the Justice Department," over "what prosecutors view as a long-standing failure to

fully comply with the [Subpoena] by Trump's team."  The details of this "battle" were kept

secret, however, as "[m]uch of the legal wrangling remains under seal."  *Id.*

      **E.**      **The December 9, 2022 Hearing**

      On Thursday, December 8, 2022, the public learned that the Government had "urged"

this Court "to hold Trump's office in contempt" over its response to the Subpoena, and that a

hearing on that request was set for Friday, December 9.  *See* Spencer S. Hsu et al., *Justice*

*Department asks judge to hold Trump team in contempt over Mar-a-Lago case*, Washington Post

(Dec. 8, 2022), https://www.washingtonpost.com/nation/2022/12/08/trump-contempt-mar-a-

lago-records/.  This extraordinary request was motivated by the Government's desire for "an

unequivocal sworn written assurance from Trump's team that all [responsive] documents have

been returned," and the Government asked this Court "to find Trump's side in contempt as long

as none of his advisers are willing to assume the role of custodian of records responsible for a

complete answer to the question."  *Id.*

      On December 9, undersigned counsel made a written request to this Court asking that the

press and public be permitted to attend this hearing on the grounds that, "[g]iven the extensive

briefing on the public record about this particular [S]ubpoena, and significant news reporting as

well on the same subject, Rule 6 no longer requires the Court to hold [the] hearing under seal."[1]

The Court held the hearing under seal and subsequently informed undersigned counsel that "the

Court held a hearing regarding an ongoing and sealed grand jury matter.  This matter remains

under seal, pursuant to Federal Rule of Criminal Procedure 6(e) and Local Criminal Rule 6.1."

      In light of this denial of access to the hearing, the Press Coalition now respectfully seeks

access to a transcript of that hearing and all other hearings this Court has held or will hold

---

[1]  A copy of the undersigned counsel's letter to the Court is attached as Exhibit A.

relating to the Government's request that Trump or his representatives be held in contempt, as well as all motions, briefs, exhibits, and other judicial records relating to this important issue.

## **ARGUMENT**

Given that the Subpoena targeted the former President, as well as the massive amount of official disclosure, high-profile collateral litigation, and public reporting surrounding this entire investigation, this request for contempt is unlike any other in memory. The Government seeks to hold a former President, a current presidential candidate, or his representatives in contempt for how they have responded to that unusual Subpoena. It is thus beyond dispute that the public has a powerful interest in understanding the Government's rationale for making such an exceptional request, the former President's arguments in opposition, and the Court's process in adjudicating this weighty issue. Indeed, the matters occurring before this Court go to the very heart of the rule of law in our democracy.

In these unique circumstances, federal grand jury secrecy rules do not stand in the way of providing the public with this important information. *Cf. Butterworth v. Smith*, 494 U.S. 624, 630 (1990) ("the invocation of grand jury interests is not some talisman that dissolves all constitutional protections") (internal marks omitted). Because this is a matter ancillary to a grand jury proceeding, the justification for sealing extends only to those discrete portions of the record that would reveal remaining secrets about matters occurring before the grand jury. The extensive public disclosures about the Subpoena have significantly narrowed the isolated bits of information that should remain sealed. The Court therefore can, and should, unseal the requested

records with only those redactions essential to protect the information, if any, that still remains

secret before the grand jury.[2]

I.     THE COURT HAS DISCRETION UNDER LOCAL RULE 6.1 TO UNSEAL
       INFORMATION IN ANCILLARY PROCEEDINGS THAT WOULD NOT
       REVEAL ACTIVITIES "OCCURRING BEFORE THE GRAND JURY"

        As this Court has noted, Fed. R. Crim. P. 6(e)(6) "requires that '[r]ecords, orders, and

subpoenas related to grand-jury proceedings . . . be kept under seal' only 'to the extent and as

long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand

jury.'" *In re Capitol Breach Grand Jury Investigations*, 339 F.R.D. 1, 7 n.5 (D.D.C. 2021)

(Howell, C.J.) (quoting Fed. R. Crim. P. 6(e)(6) (noting that filings "initially placed under seal"

were made public after this Court "direct[ed] the government to explain" its rationale for secrecy

and the government provided no such rationale)).  As such, "judicial proceedings ancillary to a

grand jury proceeding, which may include a motion 'to quash a subpoena, or to compel

testimony, or to immunize a witness,' as well as the attendant records, shall be shielded from the

public *to the extent necessary* to prevent disclosure of matters occurring before a grand jury." *In

re Grand Jury Subpoenas*, 2019 U.S. Dist. LEXIS 88421, at *5 (D.D.C. Apr. 1, 2019) (Howell,

C.J.) (citing *Dow Jones*, 142 F.3d at 502; Fed. R. Crim. P. 6(e)(5), (6); L. Crim. R. 6.1)

(emphasis added).  Local Rule 6.1 therefore provides that unsealing may occur when it is no

longer necessary to preserve the secrecy of matters before the grand jury.  Put differently, where

the need for secrecy ends as to the identity of grand jury witnesses or their substantive testimony,

the public's right to additional information begins.  Rule 6.1 thus "may be implemented by

releasing redacted documents."  2019 U.S. Dist. LEXIS 88421, at *5, 14 ("At bottom, Local

Criminal Rule 6.1 provides the Reporters Committee with access to the briefs and transcripts,

_____

[2] Just this week, in fact, a New York state trial court unsealed (with redactions) an order
revealing that the Trump Organization was held in criminal contempt in 2021 for failing to
comply with four New York grand jury subpoenas.  A copy of this order is attached as Exhibit B.

with any matters occurring before the grand jury redacted."); Order, *In re Grand Jury Subpoena*,

No. 18-3071 (D.C. Cir. June 7, 2019) (per curiam) ("order[ing] the parties to publicly file the

proposed redacted versions of their briefs and the transcript (with certain exceptions)"); *see also*

*Dow Jones*, 142 F.3d at 505 (remanding for consideration of possible redactions).

## II.     THE COURT SHOULD EXERCISE ITS DISCRETION TO UNSEAL JUDICIAL RECORDS THAT DO NOT REVEAL SECRET GRAND JURY INFORMATION

"[T]he power to punish for contempts is inherent in all courts," *Chambers v. NASCO,*

*Inc.*, 501 U.S. 32, 44 (1991), and as the Supreme Court has recognized, "[b]ecause inherent

powers are shielded from direct democratic controls, they must be exercised with restraint and

discretion." *Roadway Express v. Piper*, 447 U.S. 752, 764 (1980).  The restraint and discretion

this Court exercises is of the utmost concern here, where the Department of Justice has asked the

Court to hold the current President's political rival in contempt.  In such a complex situation, one

guiding rule of transparency seems especially apt: "the appearance of justice can best be

provided by allowing people to observe it." *Richmond Newspapers v. Virginia*, 448 U.S. 555,

572 (1980).[3]

In light of the powerful and justifiable public interest in this contempt dispute, and the

already extensive official disclosures about this issue, the public would greatly benefit from

understanding the basis for the motion for contempt, the arguments for and against that motion,

and this Court's process of adjudicating that motion.  Release of the requested records, even with

the redaction of any Rule 6(e) information that would disclose still-secret details about

proceedings before the grand jury, would shed much needed light on this ancillary matter.  *Dow*

*Jones*, 142 F.3d at 500.  The Press Coalition therefore respectfully requests that the Court enter

---

[3] Indeed, it was a secret contempt proceeding which led the Supreme Court to observe that "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver*, 333 U.S. 257, 271 (1948) (quoting 1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827)).

an order here that will facilitate the disclosure of any dockets, court orders or opinions, legal briefing, or argument transcripts ancillary to the grand jury described herein, including such materials litigating the Government's motion to hold in contempt former President Trump and/or his representatives.  *See, e.g., In re Grand Jury Subpoena*, 2019 U.S. Dist. LEXIS 88421, at *16.

## **CONCLUSION**

For all of the foregoing reasons, Press Coalition respectfully requests that this Court grant the application, unseal redacted public versions of the materials ancillary to grand jury proceedings described herein, and provide the Press Coalition notice and an opportunity to be heard in advance of future sealed proceedings on this important issue.

Dated:  December 15, 2022

Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Chad R. Bowman (#484150)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200 | Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
bowmanchad@ballardspahr.com

*Counsel for the Press Coalition*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December 2022, I caused true and correct copies

of the foregoing to be served by email and U.S. Mail First Class on the following:

James M. Trusty
Ifrah Law PLLC
1717 Pennsylvania Avenue NW, Suite 650
Washington, DC 20006
jtrusty@ifrahlaw.com

Lindsey Halligan
511 SE 5th Avenue, Suite 1008
Fort Lauderdale, FL 33301
lindseyhalligan@outlook.com

M. Evan Corcoran
Silverman, Thompson, Slutkin, & White, LLC
400 East Pratt Street, Suite 900
Baltimore, MD 21230
ecorcoran@silvermanthompson.com

*Attorneys for Donald J. Trump*

Jay I. Bratt
Julie A. Edelstein
Brett C. Reynolds
Department of Justice
Counterintelligence & Export Control Section
950 Pennsylvania Avenue NW
Washington, DC 20530
jay.bratt2@usdoj.gov
julie.edelstein@usdoj.gov
brett.reynolds@usdoj.gov

John L. "Jack" Smith
Department of Justice
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, DC 20530
jack.smith2@usdoj.gov

*Attorneys for the United States of America*


/s/ *Charles D. Tobin*
Charles D. Tobin

# Exhibit A

# Ballard Spahr
LLP

- - - - - - - - - - - - - - - - - - - -

1909 K Street, NW
12th Floor
Washington, DC 20006-1157
TEL 202.661.2200
FAX 202.661.2299
www.ballardspahr.com

Charles D. Tobin
Tel: 202.661.2218
Fax: 202.661.2299
tobinc@ballardspahr.com

Maxwell S. Mishkin
Tel: 202.508.1140
Fax: 202.661.2299
mishkinm@ballardspahr.com

December 9, 2022

*Via Email*

The Honorable Beryl A. Howell
Chief Judge, U.S. District Court for the District of Columbia
333 Constitution Avenue NW
Washington, DC 200001
howell_chambers@dcd.uscourts.gov

Re:      **Press and Public Access to December 9, 2022 Hearing**

Dear Chief Judge Howell:

This firm represents a coalition of press organizations that respectfully request access to a hearing, which we understand is scheduled to be held before Your Honor this afternoon, on the Department of Justice's motion "to hold Donald Trump in contempt of court for failing to comply with a subpoena issued this summer ordering the former president to turn over records marked classified."[1]

Former President Trump himself disclosed the existence of the grand jury subpoena at issue in his motion seeking appointment of a Special Master concerning the execution of a federal search warrant at Mar-a-Lago.  *See* Mot. for Judicial Oversight & Additional Relief at 5, *Trump v. United States*, No. 9:22-cv-81294-AMC (S.D. Fla. Aug. 22, 2022), ECF 1.  In its response to that motion, the Government not only confirmed the existence of the subpoena but also released a copy of the subpoena itself and related correspondence on the public docket.  *See* United States' Resp. to Mot. for Judicial Oversight & Additional Relief at 7-12, *Trump v. United States*, No. 9:22-cv-81294-AMC (S.D. Fla. Aug. 22, 2022), ECF 48 (discussing the subpoena); *id.* Exs. C (copy of subpoena); D (letter from Department of Justice to M. Evan Corcoran, Esq.); and E (certification of custodian of record), ECF 48-1 at 10-16.  *See also* Order, *In re Application of the United States*, No. 22-GJ-37 (D.D.C. Sept. 7,

---

[1] *See* Katelyn Polantz et al., *Justice Department seeking to hold Trump in contempt over classified documents*, CNN (Dec. 9, 2022), https://www.cnn.com/2022/12/08/politics/doj-trump-contempt-classified-documents/index.html; *see also* Spencer S. Hsu et al., *Justice Department asks judge to hold Trump team in contempt over Mar-a-Lago case*, The Washington Post (Dec. 8, 2022), https://www.washingtonpost.com/nation/2022/12/08/trump-contempt-mar-a-lago-records/

December 9, 2022
Page 2

2022) (Howell, C.J.) (authorizing the Government to disclose "the grand jury subpoenas" at issue "as well as any correspondence or communications directly flowing from them").

As the D.C. Circuit has acknowledged, "when once-secret grand jury material becomes sufficiently widely known, it may lose its character as Rule 6(e) material." *In re Grand Jury Proceedings (Miller)*, 493 F.3d 152, 154 (D.C. Cir. 2007). Given the extensive briefing on the public record about this particular subpoena, and significant news reporting as well on the same subject, Rule 6 no longer requires the Court to hold this afternoon's hearing under seal. *See In re Grand Jury Subpoenas*, 2019 U.S. Dist. LEXIS 88421, at *5 (D.D.C. Apr. 1, 2019) ("[J]udicial proceedings ancillary to a grand jury proceeding, . . . as well as the attendant records, shall be shielded from the public *to the extent necessary* to prevent disclosure of matters occurring before a grand jury.") (citing *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 502 (D.C. Cir. 1998); Fed. R. Crim. P. 6(e)(5), (6); L. Crim. R. 6.1) (emphasis added)). To the contrary, the First Amendment and common law rights of access to judicial proceedings oblige the Court to provide public access to the hearing and seal only those narrow portions that implicate still-secret grand jury material. *See Craig v. Harney*, 331 U.S. 367, 374 (1947) ("What transpires in the court room is public property.").

For the reasons above, the Court should grant the press and public access to the hearing set for this afternoon on the Government's motion for contempt.

Respectfully submitted,

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)

# Exhibit B

THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK,

                                             Petitioner,

-against-

                                             Respondent.

DECISION AND ORDER
FILED UNDER SEAL

Investigation No.

---

HON. JUAN M. MERCHAN, J.S.C.:

By Order to Show Cause, the New York County District Attorney's Office (hereinafter the

District Attorney or the People) initiated a proceeding pursuant to §§ 750A(3) and 751 of the

Judiciary Law accusing                                                                                         of

Criminal Contempt for willfully disobeying four Grand Jury subpoenas *duces tecum* and three Court-

orders.[1] A trial was conducted on October 7, 2021.

### Background

The District Attorney issued Grand Jury subpoenas *duces tecum* ("the subpoenas") to

                on March 22, 2021, April 23, 2021, May 21, 2021, and June 7, 2021. The

District Attorney, alleging that                                        had failed to comply with the subpoenas,

filed a motion to compel on July 21, 2021. As a result, this Court issued an Interim Order on July

30, 2021, to compel compliance by August 9, 2021. The Interim Order was modified on August 6,

2021. This Court issued additional orders first on August 10, 2021, to compel compliance by

August 17, 2021, and again on August 24, 2021, to compel compliance by August 25, 2021.

It is these four Grand Jury Subpoenas and three Court Orders that are the subject of these

proceedings.

---

[1] The Order to Show Cause was endorsed by the Court on September 7, 2021.

The October 20, 2020 Subpoena

At the commencement of the trial on October 7, 2021, the People asked this Court to consider evidence of ██████████████ 's failure to comply with a Grand Jury subpoena *duces tecum* issued on October 20, 2020.[1] In that instance, the District Attorney also initiated a proceeding to compel compliance. The Parties eventually entered into a Stipulation, which was So Ordered by this Court, on December 18, 2020, requiring ██████████████ to produce all documents responsive to that subpoena pursuant to a detailed schedule. It also granted the District Attorney the right to demand that a custodian from ██████████████ testify concerning ██████████ 's record retention practices, the searches conducted for records, and the efforts made to comply or, in lieu of such testimony, to demand a written certification.

At trial, the People argued that evidence of that past noncompliance is relevant to this proceeding because: (1) it establishes that ██████████████ was already represented by Counsel when it was served with the four subpoenas and three Court Orders. Thus, the delay could not be attributed to the absence of Counsel or time taken to retain counsel; (2) it demonstrates that ██████████████ had subpoena production protocols in place as part of its standard operations and procedures; (3) it demonstrates that ██████████████ was aware of, and knew, the possible consequences of failing to comply with the Court's mandates; and (4) the prior conduct demonstrates a pattern of delay and noncompliance.

This Court determined that the litigation surrounding the October 20, 2020, subpoena is relevant, reasoning the Parties' prior knowledge of the Court's policies, proceedings, and expectations provide context to the instant dispute. More importantly, the circumstances surrounding that litigation would assist the Court in assessing whether ██████████████ willfully disobeyed the Grand Jury Subpoenas and Court Orders herein.

---

[1] This subpoena is not included under Count One of the People's Order to Show Cause.

2

On October 30, 2020, the Parties agreed to rolling productions of documents responsive to the October 20 subpoena.[3] Their agreement was memorialized in a November 2, 2020 email where the Parties agreed to "substantive limitations and time extensions for productions" of the items requested in the subpoena.[4] ▐▐▐▐▐▐▐▐▐▐ agreed to provide: (1) Items 2 and 5 by November 9, 2020, (2) Item 3 by November 13, 2020, (3) Item 1 by November 20, 2020, and (4) Item 4 by November 27, 2020.

The People contended that ▐▐▐▐▐▐▐▐▐▐ failed to abide by the terms of the agreement. For example, although ▐▐▐▐▐▐▐▐▐▐ produced records in response to Items 2 and 5, the People claimed the production failed to include key portions ▐▐▐▐▐▐▐ ▐▐▐▐▐▐▐▐▐▐.[5] On November 18, 2020, ▐▐▐▐▐▐▐▐▐▐ provided a subsequent production in response to Item 2 - nine days past the return date. In another example, on December 11, 2020, ▐▐▐▐▐▐▐▐▐▐ provided records responsive to Item 1. That production included records ▐▐▐▐▐▐▐▐▐▐ had previously withheld, as it claimed the records related to conduct beyond the statute of limitations. In a December 13, 2020, email, the People informed counsel for ▐▐▐▐▐▐▐▐▐▐ that the production was deficient because it failed to include records outlined in the agreement and because it failed to explain whether the additional records were being withheld under a claim of privilege. The People eventually filed a motion to compel on December 15, 2020.

In a Stipulation and Order dated December 18, 2020, this Court directed ▐▐▐▐▐ ▐▐▐▐▐▐▐▐▐▐ to comply with the subpoena. Specifically, ▐▐▐▐▐▐▐▐▐▐ was ordered to produce

---

[3] See Respondent's Binder of Exhibits Accompanying Memorandum of Law in Opposition to the District Attorney's Request for a Finding of Contempt and Imposition of Sanctions at Exhibit B, November 2, 2020 email.
[4] See Respondent's Binder of Exhibits Accompanying Memorandum of Law in Opposition to the District Attorney's Request for a Finding of Contempt and Imposition of Sanctions at Exhibit B, November 2, 2020 email.
[5] See Respondent's Binder of Exhibits Accompanying Memorandum of Law in Opposition to the District Attorney's Request for a Finding of Contempt and Imposition of Sanctions at Exhibit B, November 2, 2020 email.

items 2, 3, and 4 by January 8, 2021, item 1 by January 21, 2021, and any records withheld pursuant to a claim of privilege by January 27, 2021.  The Order also required ███████████████, "...to produce the custodians, who conducted the searches for responsive documents to testify before the Court concerning their record retention practices and all steps taken to comply..."[6]

Between the issuance of the Court's Order on December 18, 2020, and January 28, 2021, ████ ███████████████ produced 9,000 documents - 8,810 more documents than were produced prior to the Court's intervention.  Nonetheless, those productions failed to meet the deadlines outlined in the Stipulation and Order.

At an ensuing hearing conducted on January 28, 2021, ███████████████ produced ███████████████ for ███████████████ the person whom ███████████ deemed most knowledgeable of the company's record keeping practices.[7] ████████ testified that ███████████████ had "successfully responded to countless subpoenas" in the past, including inquiries from ███████████████████████████████████████████████████████████████████. He indicated that he worked internally with ███████████████████████ for years and described the processes they employ to successfully comply with subpoena requests.[8]

Following the hearing, ███████████████ notified the District Attorney that it possessed additional documents responsive to Item 1.  The records were produced on February 8, 2021, and February 19, 2021.  The latter production coming nearly one month past the January 21, 2021 deadline.  A privilege log pertaining to the October 20, 2020 subpoena was turned over the day after ████████ testified - two days past the Court ordered deadline.  On February 22, 2021, ████

---

[6] See District Attorney Exhibit 3, December 18, 2020, Stipulation and Order.
[7] See District Attorney Exhibit 4, Hearing January 28, 2021, page 4 line 14 through 15 and line 22 through 24.
[8] See District Attorney Exhibit 4, Hearing January 28, 2021, page 18 line 6 through 8, page 25 line 17 through page 26 line 16.

███████████████ produced a revised privilege log, in addition to documents that were previously withheld pursuant to a claim of privilege. [9]

Following these productions, the People filed a letter on March 1, 2021, accusing ███████ of misleading the Court. The People alleged that ███████ testified falsely when he represented that production was complete, as documents related to ███████ remained outstanding. Specifically, at the hearing, the People asked ███████ "…did ███████ produce all responsive documents by the deadlines set forth in the October 30, 2020 agreement," to which ███████ replied, "I know we've produced all responsive documents to the subpoena, and we have – I believe – made good-faith and diligent attempts to produce all documents that were responsive."[10] The People maintained ███████ knew about the outstanding records at the time he testified because: (1) ███████ had produced operating agreements and general ledger entries for ███████ previously on November 23, 2020, (2) the People insisted on December 24, 2020, that the search for records include the term ███████ (3) the witness testified that ███████ was the only consultant involved in the projects identified in Item 1, and (4) on February 8, 2021, ███████ produced to the District Attorney the ███████ ███████ records, which it had also produced to ███████ approximately two months earlier.[11] According to the People, the records produced on February 8, 2021, were unmistakably responsive to Item 1 of the subpoena, which sought documents pertaining to the payment of consultants. Notably, the People claimed, "the vast majority of the records were e-mails informing ███████ and ███████ of their ███████" The People concluded that ███████, as ███████ should have known that the ███████ documents remained outstanding.

[9] See District Attorney Exhibit 5, Letter filed under seal dated March 1, 2021.
[10] See District Attorney Exhibit 4, Hearing January 28, 2021, page 29, Lines 4 through 10.
[11] See District Attorney Exhibit 6, Letter filed under seal dated March 15, 2021.

In a second letter, filed on March 15, 2021, the District Attorney further accused █████████ of having testified falsely. The letter directed the Court's attention to the portion of the witness' testimony where he was asked, "█████████, have you and █████████ responded to multiple subpoenas from █████████████████████████████████████████████████████████ █████████████████████████████████████████████████" to which █████ replied, "Yes, quite a bit." Counsel for █████████████████████ then asked, "Have you ever had a situation with any of those subpoenas over the last several years, with all of these █████████ where there was a complaint about your diligence or the productions being made," to which █████ replied, "Never."[12] The People surmised █████████ testified falsely because he was intimately involved with █████████████████████ s productions to █████████ and was aware of the litigation that ensued which concerned serious deficiencies with their document productions. [13] The People highlighted that █████████ had submitted at least four affidavits in the past attesting to his knowledge of the facts and pleadings in connection with the action brought by █████████████████████[14] In that matter, █████████████████████ also brought an order to show cause seeking to compel compliance. According to the People, the compliance issues in that litigation preceded the compliance issues alleged by the People here by a matter of months. It was the People's position therefore, that █████████ was not truthful when he testified that there had never been a complaint about diligence. Counsel for █████████ and █████ █████████████████████ offered an alternative explanation. In their view, █████████ understood the question was directed at complaints about him personally, rather than in his professional capacity as █████████████████████████████████ because he had, "…never been sanctioned in

---

[12] See District Attorney Exhibit 4, January 28, 2021 Hearing transcript, page 79 line 6 through 16.

[13] See District Attorney Exhibit 7, Letter filed under seal dated March 15, 2021.

[14] See District Attorney Exhibits 5 and 7, March 1 and March 15 letters to Hon. Juan M. Merchan

connection ... (with) document productions nor... accused of contemptuous behavior (personally)."[15]

This Court addressed the People's allegations in a letter on March 17, 2021. The Court indicated it was perturbed by the accusations that ▮▮▮▮▮▮ had testified falsely, further observing that the explanation proffered in his defense was not entirely credible. The Court noted "[a]lthough the Court is not inclined to make a finding of contempt at this time..." it will "endeavor to ensure the integrity of subpoena compliance," while "holding all counsel to the highest ethical and professional standards." The Court further cautioned that it would "not look kindly upon any future dilatory tactics" and would "not hesitate to impose sanctions when appropriate and necessary.[16]

### The Four Subpoenas

The Grand Jury subpoena issued on March 22, 2021, contained 11 categories of records returnable April 12, 2021.[17] The District Attorney alleged that as of July 21, 2021, nearly four months later, ▮▮▮▮▮▮ had failed to comply with at least three categories.

The subpoena issued on April 23, 2021, contained four categories of records returnable May 14, 2021.[18] The District Attorney alleged ▮▮▮▮▮▮ failed to comply with two categories as of July 21, 2021.

The subpoena issued on May 21, 2021, contained four categories of records returnable June 4, 2021.[19] The District Attorney alleged ▮▮▮▮▮▮ failed to comply fully with at least two categories as of July 21, 2021.

---

[15] See Respondent Pre-March 22, 2021 Exhibit A at page 6.

[16] See District Attorney Exhibit 8, March 17, 2021 Ruling.

[17] See District Attorney Exhibit 9, March 22, 2021 Grand Jury Subpoena to ▮▮▮▮▮▮

[18] See People's Exhibit 10, April 23, 2021 Grand Jury Subpoena to ▮▮▮▮▮▮

[19] See People's Exhibit 11, May 21, 21, 2021 Grand Jury Subpoena to ▮▮▮▮▮▮

The subpoena issued on June 7, 2021, contained seven categories of records returnable June 21, 2021.[20]  The District Attorney alleged ████████████ had failed to produce any records as of July 21, 2021.[21]

On July 21, 2021, the People moved for an Order to Compel ████████████ to complete productions for the four subpoenas.  The People also asked the Court to impose "coercive fines" of $60,000 for each day of noncompliance.[22] ████████████ responded.  After reviewing the Parties' submissions, this Court found good cause for the issuance of an Interim Order to compel on July 30, 2021.  The Order directed ████████████ to produce all documents responsive to the subpoenas by August 9, 2021. ████████████ was also ordered to produce on August 10, 2021, the custodians who conducted the searches for responsive documents in order to testify concerning their record retention practices and the steps taken to comply with the Order.[23] The Order cautioned, "…should the Court find that ████████████ ████████ has not fully complied with the subpoenas or the Court's Orders, it will make a determination as to what penalties, sanctions and fines should be applied."[24]

Between the filing of the People's motion to compel on July 21, 2021, and the deadline set in the Court's Interim Order of August 9, 2021, ████████████ produced over 2,890 documents, totaling over 82,000 pages.[25]  However, on August 5, 2021, the People filed a letter with the Court which described ████████████ s continued failure to comply fully with the subpoenas.

---

[20] See People's Exhibit 12, June 7, 2021 Grand Jury Subpoena to ████████████.
[21] See Respondent's Exhibit P-2, Amended DANY Production Chart.
[22] See People's Exhibit 22, July 21, 2021 Sealed Application to Compel ████████████
[23] See People's Exhibit 23, July 30, 2021 Interim Order.
[24] See People's Exhibit 23, July 30, 2021 Interim Order.
[25] See Respondent's O-2, Defense Response to OTSC dated September 20, 2021 at Page 29.

This Court subsequently modified the Interim Order on August 6, 2021. ▓▓▓▓▓

▓▓▓▓▓ was no longer required to produce custodians on August 10, 2021, but the Parties were ordered to appear and address the Court regarding the status of compliance. The Court noted, "[n]otwithstanding ▓▓▓▓▓'s explanations for its failure to comply, it is the opinion of this Court that certain specific items should have been provided, well before the Motion to Compel was filed on July 21, 2021." The letter further stated that ▓▓▓▓▓'s explanations, "…do not justify its failure to turn over materials responsive to Items 5 and 8 of the Grand Jury Subpoena dated March 22, 2021, and Item 2 of the Grand Jury Subpoena dated April 23, 2021." The Court reminded ▓▓▓▓▓ of its obligation to complete productions by the close of business Monday, August 9, 2021. The letter further cautioned, "[i]n the absence of full compliance or a motion to quash, the Court may address the parties in a summary contempt proceeding pursuant to the Judiciary Law for failure to comply fully with this Court's lawful mandate." The letter noted that "the Court's demonstrated restraint should not be misinterpreted" as tolerance of continued failure to comply without consequence.[26]

At the status conference on August 10, 2021, this Court observed, and ▓▓▓▓▓ ▓▓▓▓▓ conceded, that ▓▓▓▓▓ had failed to comply with the Court's mandates.[27] Not only had ▓▓▓▓▓ failed to attain full compliance with the subpoenas, but it also disregarded the Court's Interim Order requiring written confirmation that all responsive documents had been produced or, in the alternative, that none had been identified, for seven separate categories of documents. ▓▓▓▓▓ failed to provide a *single* written confirmation, much less seven. In an email from counsel, delivered the evening before the conference, no explanation, excuse or apology was offered for the absence of the certifications. Instead, ignoring the Court's

---

[26] See People's Exhibit 24, August 6, 2021 Letter from Hon. Juan M. Merchan.
[27] See People's Exhibit 27, August 10, 2021, Transcript at page 14 line 16 through 20.

9

Order, Respondent merely asserted "[w]hen productions are complete, the Company will issue a certification." On the record, on August 10, 2021, the Court addressed the noncompliance with counsel who apologized and replied "[w]e will remedy that forthwith."[28]   The Court found Respondent had violated the Court's Order for its failure to provide the written confirmations.

The Court directed the Parties to meet with the Court's Attorneys immediately following the conference and to review line-by-line and item-by-item the records described in the subpoenas to determine what remained outstanding.[29]   The Court also directed the Parties to meet with the Court virtually on a biweekly basis to provide updates. Finally, the Court ordered ██████████████ to furnish all productions by August 17, 2021.[30]

On August 17, 2021, ██████████████ filed a certification endorsed by ████████ ████████ for ████████████████ The certification attested to ████████'s ████████ tenure with the Company, his familiarity with its record keeping practices, and his understanding of the document requests contained in the four subpoenas. His certification further specified his familiarity with the searches conducted to identify and produce the records that had been delivered to the District Attorney. The certification asserted that all responsive documents had been produced and specifically identified items referenced in the subpoenas.[31]

Two days later, the District Attorney identified additional outstanding items and further compliance issues. According to the People, ██████████████'s productions failed to include documents related to ████████████████ linked to ██████████ a ██████ ████████ employee. The Parties agreed that also missing were records containing the search terms ████████ and ████████ as well as an email from an employee named ████████████

---

[28] See People's Exhibit 27, August 10, 2021, transcript at page 28 line 6 through line 10.
[29] See People's Exhibit 27, August 10, 2021, transcript at page 14 line 7 through 15.
[30] See People's Exhibit 27, August 10, 2021, transcript at page 11 lines 19 through 21.
[31] See People's Exhibit 31, Signed Production Certification from ████████████████

containing the term ▮▮▮▮▮▮ Finally, the letter detailed missing records from item 1 of the June 7, 2021 subpoena and item 1(b) of the April 23, 2021 subpoena.[32] ▮▮▮▮▮▮ was directed by the Court to address each issue by the close of business Friday, August 20, 2021.

On August 20, 2021 via email, ▮▮▮▮▮▮ addressed the issues raised by the District Attorney.[33] ▮▮▮▮▮▮ claimed that it had identified records related to ▮▮▮▮▮▮ pertaining to ▮▮▮▮▮▮ some time back but "inadvertently" failed to send them to their eDiscovery vendor for production. Specifically, Counsel stated, "The People have asked why no documents were produced for ▮▮▮▮▮▮ as a custodian for the ▮▮▮▮▮▮ related document requests. Following yesterday's conference we looked into this issue and discovered that although the Company's IT department previously searched for these documents, they inadvertently failed to include them in the documents that were sent to the eDiscovery vendor. The documents have now been sent to the vendor for processing and we anticipate will be ready for production to the People by the end of the day, Monday, August 23, 2021." No further explanation was provided for this avoidable delay. Respondent also acknowledged the District Attorney had accurately described missing records containing the term ▮▮▮▮▮▮ and conceded the term had not been properly searched. With respect to the missing email from the custodian account of ▮▮▮▮▮▮ Counsel for ▮▮▮▮▮▮ indicated, "[w]e have been diligently working with the Company's IT department to determine why this email was not produced but we have confirmed that other emails in this email chain have been produced."[34]

On August 23, 2021, the People informed the Court by letter that two sets of records remained outstanding. The records again included the ▮▮▮▮▮▮ documents and the ▮▮▮▮▮▮

---

[32] See People's Exhibit 32, August 19, 2021 Email from ADA Daniels at 4:25 PM.
[33] See Respondent Exhibit C-1.
[34] See People's Exhibit 33, August 20, 2021 Letter to Hon. Juan J. Merchan

11

██████ email.[35]  The People stated it was their understanding that ████████████████ was

unable to produce those documents due to a "migration issue," allegedly caused by the transfer of

information from a prior server to a recently acquired cloud-based server. According to the District

Attorney, ████████████████ required more time to rerun searches to gauge the scope of the

problem and determine how many records could be missing.[36]

On August 24, 2021, the Court held a status conference. At the conference, ████████████

████████ confirmed what the District Attorney had reported. ████████████████

disclosed the possibility that records had not properly migrated when it switched servers in 2020.[37]

████████████████ further stated it had been under the belief that all documents had properly

migrated. It claimed that it was the absence of the ████████ email that prompted the IT department

to question whether the data had transferred properly. This migration issue required ████████

████████ to rerun its searches to verify whether previous productions were complete. Upon

learning this, the Court directed ████████████████ to provide the District Attorney with a

status report by the close of business Friday, August 27, 2021. The Court further ordered ████

████████ to produce all documents relating to ████████████ by 10 am on August

25, 2021, as she was scheduled to testify in the Grand Jury later that day and the People needed

those documents to properly examine her. The Court was unequivocally clear that every document

needed to be produced.

On August 27, 2021, ████████████████ communicated by email that the scope of the

server migration issue was still undetermined. The email stated, "it is impossible for the Company

and its vendor to have completed this analysis by 5:00 pm Friday, August 27th." Respondent

---

[35] See People's Exhibit 34, August 23, 2021 Letter to Hon. Juan J. Merchan
[36] See People's Exhibit 34, August 23, 2021 Letter to Hon. Juan J. Merchan.
[37] See People's Exhibit 35 August 24, 2021 Transcript Page 5 line 8 through 12.

additionally disclosed that it had found an *additional* 505 documents relating to ███████ [38]
███████████████████ indicated it would forward those records to the District Attorney on
August 28, 2021, that is, three days after ████████ testimony in the Grand Jury. Respondent
requested until the close of business on August 30, 2021, to further investigate the migration issue
and report.[39]

On the evening of August 30, 2021, Respondent informed the People that searches were
being conducted and again expressed its intention to produce non privileged documents including
███ 1099, and ████████ by September 1, 2021.[40]

In an August 31, 2021 email to the People, Counsel attempted to further explain the
migration issue. The email stated, "[f]rom 2004 until early 2016, the Company's IT department
utilized ████████████ as its server platform." At that time, ██████████████ created,
"…two types of PST files – Active PST files and Archive PST files." According to Counsel, "Active
PST files are essentially supplemental storage folders…," which provide more space in an
employee's email account to increase efficiency. "Archive PST files are typically created as
procedural backup when, for example, a user would receive a new computer and data on their old
computer needed to be moved to their new computer." Counsel explained that in early 2016, ███
████████████ transitioned from a ██████████ email server to a cloud-based
██████████ email platform. Counsel revealed, "that migration did not include any Archive
PST files." In other words, it did not include certain data from a user's older computer.[41] In 2020,
the Company again transitioned email servers, this time to ███████ based platform.

---

[38] See Respondent's Exhibit M-1.
[39] See Respondent Exhibit M-1.
[40] See Respondent Exhibit Q-1.
[41] See Respondent's Exhibit Q-1

According to Counsel, the Company did not initially produce the 2015            email because it had been deleted, and thus, not in the active mailbox at the time of the 2016 migration.[42] Counsel further explained, that when           s IT department conducted its searches, it failed to include the Archive PST files, where the     email was stored.  Counsel advised that the Company was addressing the issue by adding all Archive PST files to the total data set to re-run searches.  Counsel also expressed the Company's plan to re-run searches for the October 2020 and February 2021 subpoenas.[43]

### Trial

The trial was conducted on October 7, 2021.  The parties stipulated to exhibits which included, among other items: subpoenas, correspondence, motions, orders, and transcripts.  Both Parties presented argument.

### Count 1

Count 1 addresses whether             willfully disobeyed the Grand Jury Subpoenas issued to it on March 22, 2021, April 23, 2021, May 21, 2021, and June 7, 2021.

To find Respondent guilty of criminal contempt, the People are required to prove Respondent's guilt beyond a reasonable doubt. *See, Matter of Gold v. Valentine,* 318 N.Y.S.2d 360, 361 (2nd Dept. 1970).  More specifically, the District Attorney is required to prove

was served with the subpoenas, had knowledge of the Court's mandates and orders, and willfully disobeyed them. *See, Vacco v. Consalvo,* 176 Misc.2d 107, 114 (Bronx Co. Sup. Ct. 1998). The First Circuit has held that, "[w]illfulness almost necessarily has to be proved as an inference from circumstantial evidence." *See, Goldfine v. United States,* 268 F.2d 941 at 945 (1st Cir. 1959). Respondent's opposition papers correctly state that while, "neither the Judiciary Law nor the case

---

[42] See Respondent's Exhibit Q-1

[43] See Respondent's Exhibit Q-1.

14

law offers a definition of the term 'willful,' it is "best defined as intentional," citing *El-Dehdan v. Dehdan*, 114 A.D.3d 4, 15-16 (2nd Dept. 2013).[44] The Second Department has also explained, knowingly failing to comply with a court order gives rise to an inference of willfulness which may be rebutted with evidence of good cause for noncompliance." *See Dalessio v. Kressler*, 773 N.Y.S.2d 434 (2nd Dept. 2004) *internally citing Ferraro v. Ferraro*, 272 A.D.2d 510 at 512 (2nd Dept. 2000

Here,                          accepted the subpoenas and produced documents responsive to them.  Thus, whether the subpoenas were properly served is not at issue.[46]

That                          partially complied with the subpoenas demonstrates that it understood what it was directed to produce - contrary to its claims at trial that the subpoenas were overbroad and vague.[47]  In their opposition papers to the Order to Show Cause,

acknowledged its obligation to comply and produce all documents in its possession that were responsive to the subpoenas and Court Orders.[48]  Following this Court's intervention,

produced significant amounts of records expeditiously.  Its performance on those occasions demonstrates that its prior failures were avoidable and therefore inexcusable.

Indeed, although                          complied in part, it acknowledges that it failed to comply in full.

offers two explanations for its noncompliance.  First, it claims the return dates of the subpoenas were unreasonably short given the scope and breadth of the demands. Second, it claims the subpoenas were vague, making compliance impossible and rendering the subpoenas unenforceable.[49]                          s defenses are undermined however, by the fact that it *never* sought this Court's intervention to quash, modify or clarify the terms of the

---

[44] See Respondent's O-2, Defense Response to OTSC dated September 20, 2021 at Page 24.
[46] See Respondent's Exhibit N-2, Memorandum in Opposition to the People's Order to Show Cause at page 3 and 4.
[47] See Respondent's Exhibit N-2, Memorandum in Opposition to the People's Order to Show Cause at page 8.
[48] See Respondent's Exhibit N-2, Memorandum in Opposition to the People's Order to Show Cause at page 27.
[49] See Respondent's Exhibit N-2, Memorandum in Opposition to Order to Show Cause at Page 6 and 28.

subpoenas.[50]  Nor does the record support ███████████              s claim that it believed it was

permitted to produce documents on a rolling basis. This Court specifically asked the People

whether they had consented to rolling productions. ADA Solomon Shinerock responded, "[n]ot in

the context of these subpoenas. We had in the past indicated initially in some of the prior

subpoenas, but we had not discussed rolling productions with ████████████ in the

context of the subpoenas at issue in this proceeding."[51]

At trial, the People acknowledged that compliance with the March 22, 2021 subpoena could

have required more than the proffered three weeks. Nonetheless, ████████████ was not

relieved of its duty either to comply with the subpoenas or seek Court intervention, regardless of the

People's expectations. The record is clear that the Company failed to produce responsive

documents without explanation. For example, although ████████████ informed the

District Attorney's Office that data responsive to the March 22, 2021 subpoena was "being

unarchived," and that its "production [would] be delayed by a number of days,"[52] the Organization

did not produce those records until August 13, 2021, *more than three months later.*[53] According to ADA

Daniels, some of the records in that production were date stamped April 28, 2021.[54] This

communication and the ensuing production three months later demonstrates that the Company

withheld records past the March 22 subpoena return date of April 12 and in the process also failed

to meet the August 9 deadline imposed by the Court's Interim Order of July 30, 2021.

This Court is unpersuaded that the claimed vagueness of the subpoenas made it particularly

difficult for ████████████ to comply. Again, rather than moving to quash for vagueness,

---

[50] ████████████ did not seek judicial intervention for the first time until October 14th when it filed a Motion to Quash in response to a September 30, 2021 subpoena. That motion was made seven days after the instant trial.

[51] See Trial Transcript starting at page 42 line 25 through page 43 line 3.

[52] See District Attorney Exhibit 16, May 2, 2021 Memorandum from Counsel at page 5.

[53] See District Attorney Exhibit 30, Email from Counsel at 8:08 PM.

[54] See Trial Transcript at page 27, line 6 through line 13.

Case 1:22-mc-00128-BAH   Document 1   Filed 12/15/22   Page 39 of 50

██████████████████ made partial productions, sought clarifications from the People, and attempted to negotiate search terms. Because ████████████████ endeavored to comply, it was obligated to do so fully. However, "for the purpose of fending off a contempt adjudication, partial or even substantial compliance with a court order is not obedience to it." *See Vacco at 115 (internally citing Kuriansky v. Azam, 575 N.Y.S.2d 679 [2nd Dept. 1991]).*[45]

There can be no dispute that the deadlines were not met. Respondent's Exhibit P-2 is a chart which tracks Respondent's document productions. The chart illustrates the following: of the twenty-four productions responsive to the March 22 subpoena, only four were made by the April 12 return date; of the eighteen productions responsive to the April 23 subpoena only one was made prior to the May 14 return date. There were no document productions for the May 21 subpoena or the June 7 subpoena prior to their return dates.

The record demonstrates that ████████████████ had the capability to provide records promptly, but simply allowed the deadlines to pass. Again, Respondent's own Exhibit P-2 illustrates this point. Twenty-six of the fifty-seven productions were not made until the three-week period between the People's filing of the Motion to Compel on July 21, 2021, and the Court's second ordered deadline of August 17.[56] Between July 21 and the date of the Court Ordered conference on August 10, ████████████████ produced more than 2,890 documents totaling over 82,000 pages.[57] In the following week, the production included more than 200,000 documents totaling over 1,593,000 pages.[58] At trial, ADA Daniels provided context when she stated, in contrast to the preceding productions, "[f]rom March 22, 2021 through the filing of the motions to compel on July 21, 2021 ████████████████ produced approximately 40,000 documents which is a significant

---

[45] See Trial Transcript starting at page 59 line 19 through page 60 line 1.
[56] See Respondent's Exhibit P-2, Amended DANY Production Chart.
[57] See Respondent's Exhibit N-2, Defense Response to OTSC dated September 20, 2021 at page 12.
[58] See Respondent's Exhibit N-2, Defense Response to OTSC dated September 20, 2021 at page 14.

17

number of responsive records, but is a slim fraction of the total number of responsive records that we have received to date…"[59]

███████████████ consistently failed to comply fully, if at all, with the subpoenas but dramatically increased its productions after the People sought Court intervention. This conduct demonstrates the Company's indifference to the subpoena requests and deadlines and supports the inference that ███████████████ willfully disregarded the four subpoenas

### Count Two

This Court issued an Interim Order on July 30, 2021, directing ███████████████ to comply with the four subpoenas by August 9, 2021. The Order specified which items remained outstanding for each subpoena. It also directed the Company to provide written confirmation that all responsive documents had been produced or that none could be found for each of seven categories. The Order was modified on August 6, 2021, relieving ███████████████ of its obligation to produce the custodians who conducted the searches. However, ███████████ was ordered to fully comply with the subpoenas or, in the alternative, to file a motion to quash or otherwise seek relief from the Court. The Parties were ordered to appear on August 10, 2021 for a status conference.

███████████████ failed to comply with the Interim Order by the August 10 deadline. Specifically, it failed to comply with the subpoenas, and it failed to provide written confirmation of compliance as directed by the Court. In the Court's presence, at the August 10 conference, Counsel for ███████████████ implicitly conceded it had not met the deadlines when he stated, "[f]or the reasons articulated, where we are down to now, is we basically have two large document requests that are being produced either today or tomorrow."[60] Counsel endeavored

---

[59] See Trial Transcript at page 28 lines 4 through 9.
[60] See District Attorney Exhibit 27, August 10, 2021 Transcript at pages 4 line 23 through page 5 line 1.

to explain, "[t]here is a document called                          ..The [People] can ask

for that. The question has been how do you search for that?[61]" It is therefore evident the

Corporation understood what the subpoena called for but claimed it did not know how to locate the

records. Counsel also conceded, "I should have come to the Court, and your Honor kind of

suggested that in your letter of Friday, afternoon, you know, don't wait, come to me, make a motion

to quash or do whatever you have to do."[62]

     Significantly,                   failed to provide a single confirmation that all

responsive documents had been provided or that none had been found for each of the seven

categories. Instead, in its e-mail of August 9, Counsel wrote, "[w]hen the productions are

complete, the Company will issue a certification."[63] The Court addressed Counsel, "[y]our response

that when productions are complete the Company will issue a certification. (Counsel) that is not

what I asked. That is not what I directed." To which Counsel responded, "I apologize."[64] The

Court further observed, "The bottom line whether you were careful or not, (Counsel), by not

providing the response, you violated this Court's order, plain and simple." To which Counsel

replied, "We will remedy that forthwith."[65]

                      was still not in full compliance with *any* of the subpoenas as of the

August 9, 2021 deadline in the Order of July 30, 2021, as modified on August 6, 2021.

---

[61] See District Attorney Exhibit 27, August 10, 2021 Transcript at page 5 line 11 through 18.
[62] See District Attorney Exhibit 27, August 10, 2021 Transcript at page 7 line 22 through 25.
[63] See District Attorney Exhibit 25, August 9 Email from Counsel
[64] See District Attorney Exhibit 27, August 10, 2021 Transcript at page 25 line 18 through 23.
[65] See District Attorney Exhibit 27, August 10, 2021 Transcript at page 28 lines 6 through 10.

## Count 3

Count three pertains to the Court Order of August 10, 2021 which directed ▮▮▮▮▮ ▮▮▮▮▮ to comply with the four subpoenas and the Court's Interim Order of July 30, 2021, by August 17, 2021.[66]

On August 17, 2021, ▮▮▮▮▮ submitted a sworn certification signed by its ▮▮▮▮▮ asserting that it had fully complied with the subpoenas. However, at a conference on August 19, 2021, the People again, accused ▮▮▮▮▮ of noncompliance. The Court directed ▮▮▮▮▮ to respond to the People's allegations in writing by 5:00 pm August 20, 2021 and to produce all outstanding documents by August 23, 2021. The Court scheduled another status conference for August 24, 2021. In a letter dated August 20, 2021, ▮▮▮▮▮ acknowledged its productions to date were deficient. ▮▮▮▮▮ ▮▮▮▮▮'s certification of compliance submitted three days earlier was therefore invalid.

The following lapses were identified: (1) the Information and Technology department set aside search results for ▮▮▮▮▮ but inadvertently failed to forward them to its eDiscovery vendor. As a result, the vendor did not process the documents and the People did not receive them; (2) the failure to include the search term ▮▮▮▮▮ and (3) the Company's failure to produce the email from ▮▮▮▮▮[67] The letter also indicated the Company was investigating technical issues.

In this Court's view, it is unacceptable that the ▮▮▮▮▮ documents, which were purportedly identified and set aside by the Corporation's IT department, were not forwarded to the eDiscovery vendor and simply sat idle for as much as four months. The People had requested that the Company add ▮▮▮▮▮ as a custodian to its searches as far back as April 2.[68] By August

---

[66] See District Attorney Exhibit 29 August 10, 2021, Order.

[67] See District Attorney Exhibit 33, August 20, 2021 Letter to Hon. Juan M. Merchan.

[68] See District Attorney Exhibit 14, Email from ADA Shinerock at 7:54 am.

17, ████████████████ still had not produced the records. Despite assurances in its August 20

letter that the records would be provided by August 23, they were not delivered. Instead, Counsel

now claimed that additional searches were required due to technical issues involving data transfer

from a prior server to a cloud-based server.[69] After learning of this, the Court held a conference the

next day. At the August 24 status conference, Counsel indicated, "[i]n an abundance of caution ████

████████████ is rerunning currently the ██████████████████ and its ██████

██████ and as they did back from the March subpoena, the searches were run in April, the entire

search has been rerun in the Company's database and it is literally being processed as we speak to

determine ultimately if any documents were left behind as a result of the migration."[70]  Thus, the

Company's excuses had apparently evolved. Originally, the documents had simply not been

forwarded. Now, a technical issue related to the migration of documents from a prior server

necessitated additional searches.[71]

This conduct, viewed as a whole, supports the inference that ████████████████

willfully disobeyed the Court Order of August 10, 2021.

Count 4

Count 4 pertains to the Court's Order of August 24, which directed ████████████████

to produce all of the ██████████████ records by 10 am on August 25, 2021 and further directed

██████████████████ to provide a meaningful report on the status of the server migration issue

by the end of business on Friday, August 27, 2021.

At the August 24 conference, this Court clearly directed "I want those documents in the

People's hands by 10 tomorrow morning, period. Every single document. I do not want to hear

later, a week from now, we overlooked one, you know, we missed one, there was a migration

---

[69] See District Attorney Exhibit 34, August 23, 2021 Letter to Hon. Juan M. Merchan.

[70] See District Attorney Exhibit 35, August 24, 2021 Transcript at page 4 line 20 through page 5 line 2.

[71] See District Attorney Exhibit 34 August 23, 2021 Letter to Hon. Juan M. Merchan.

problem."[72]  Nonetheless,                              did not produce all the records related to

                by the August 25, 2021 deadline.

     Later in an email on August 27, Counsel revealed that an additional 505 documents related

to              had been identified by the Company.[73]  The record is not clear as to when the

Company learned about the existence of the additional records, but that information was not

disclosed until three days after the witness had testified in the grand jury.  In the same email,

                informed the Court that it was impossible to assess the server migration issue

by the Court's imposed deadline and requested until the close of business Monday, August 30 to

further report.  Nonetheless,                              failed to update the Court by its self-imposed

deadline of August 30.  Instead, a communication was delivered to the District Attorney's Office.

     The server migration issue called into question the entirety of                              s

productions to date.  Further the migration issue only came to light because the People insisted that

there existed a document, which they obtained a copy of from a third party, but which had not yet

been turned over by the Corporation.  It was only after repeated requests that

                disclosed that every one of its previous searches had failed to account for Archived

PST files.  This Court is hard pressed to accept that                              with its vast resources,

and its ability to hire and retain the best and the brightest minds in the fields of law, compliance, and

IT, failed to anticipate and recognize, that Archive PST files harbored information responsive to the

subpoenas and Court Order and perhaps more importantly, that the PST files had not migrated to

the new server.

     Respondent's opposition papers to the Order to Show Cause show that the Company had

been put on notice about a possible migration issue.  In 2020, in connection with a document

---

[72] See District Attorney Exhibit 35 August 24, 2021 Transcript at page 13 lines 12 through 17.
[73] See District Attorney Exhibit 36 August 25-27 Email Chain, August 27 from Counsel at 5:05 pm.

production to ███████████ a ████████████ employee named ████ complained

that her e-mails had not fully migrated. ████ testified on June 14, 2021, in a deposition taken

by ██████████████████ that he believed the Company's IT department had looked into

████████ s complaint and determined the problem was limited to her.[74]  Clearly that was not the

case.  Nonetheless, despite the obvious red flag, the Company failed to thoroughly investigate or

otherwise take appropriate remedial action.

Counsel explained in an email on August 31 that the company had been in the practice of

creating Archive PST files for about 14 years.[75]  Those files stored data the Company's employees

deleted.[76]  In 2016, the Company moved from a ████████████ server to a ████ cloud-

based platform; however, "the migration did not include any archive PST files," and in 2020, the

Company changed servers again.[77]  The ████████ email was in one of the Archive PST files.[78]

██████████████████ nonetheless, urges this Court to accept that because its ████████████

████████ previously testified that only one company employee had been affected by the

migration issue, it was therefore reasonable to believe the server migration had been successful.[80]

This Court cannot reach the same conclusion.  It was the Company's general practice for

over a decade to create and maintain Archive PST files, and Respondent was on notice of a possible

migration issue at least since 2020.  ████████ testified that the complaint was investigated and

found to be an anomaly.  Whether such an investigation was in fact conducted and whether the

investigation in fact concluded that ████ s migration issue was merely an anomaly, are not

---

[74] See Respondent's Defense Response to OTSC dated September 20, 2021 at page 17.

[75] See Respondent's Exhibit Q-1

[76] See Respondent's Defense Response to OTSC dated September 20, 2021 at page 18.

[77] See Respondent's Exhibit Q-1

[78] See Respondent's Exhibit Q-1

[80] See Respondent's Defense Response to OTSC dated September 20, 2021 at page 18, footnote 7.

questions this Court has to answer. It was reasonably foreseeable that deleted email, stored in archived files, would become relevant to future inquiries. At a minimum, the Corporation's decision not to search the Archive PST files amounted to intentionally turning a blind eye. At worse, it was a willful and deliberate failure to comply with the subpoenas and this Court's Order of August 24, 2021.

## Conclusion

This Court recognizes that                 has expended significant resources in connection with this ongoing investigation. The Corporation has retained attorneys, eDiscovery vendors and other professionals at significant cost. It has made 123 separate document productions, totaling over 3,500,000 pages.[81] In some instances, the subpoenas required to search the records of nearly 50 different business entities dating back to 2005. As this court acknowledged on October 7, 2021, "[t]he issue is not whether [you] are working hard. I don't even question this has been a massive undertaking. That is probably an understatement ..." Nevertheless, "...what we get down to is as of today...we establish that the four subpoenas were not fully complied with until early to mid-September. Same goes for the Court's orders...they still have not been complied with because there are still privilege issues which I'm led to believe will be resolved by October 31."[82]

Respondent argues that a finding of criminal contempt is reserved only for those instances where documents have been destroyed or concealed. This Court disagrees. What the People are required to prove to make out a prima *facie case* is that the documents were willfully withheld. "Willfulness almost necessarily has to be proved as an inference from circumstantial evidence ... The government does not have the burden of negativing all possible excuses for noncompliance

---

[81] See Respondent's Defense Response to OTSC dated, September 20, 2021.
[82] See Transcript October 7, 2021, page 95 line 22 through page 96 line 6.

24

with a court order. It is enough to make out a prima facie case for the government to show, as the government did below, that the appellants, in response to the interim court order calling for the production of corporation records, refused to surrender them when they were in existence and within their control." *See Goldfine v. United States*, 268 F.2d 941 at 945 (1ˢᵗ Cir. 1959) (*citing Nilva v. United States* 352 U.S. 385 at 392 [1956]). There is no question that many documents were in existence and within Respondent's control and yet not produced. Not only does the record demonstrate this, but                     has conceded this point on several occasions. The only question for this Court to decide then is whether                     *willfully* disobeyed the subpoenas and Orders.

To find Respondent guilty of criminal contempt, the People are required to prove Respondent's guilt beyond a reasonable doubt. Although                     claims there were good cause reasons for its noncompliance, it is "well settled that a plea of hardship will not excuse the failure to comply with a subpoena's command" and "[w]here the defendant is responsible for his inability to comply, no matter what the hardship, this defense is not available to him." *See People v. Forsyth* 439 N.Y.S.2d 808 at 810 (N.Y. Co. Sup. Ct. 1981) (*citing United States v. Asay*, 614 F.2d 665, 660 [9ᵗʰ Cir. 1980]; *United States v. Swingline, Inc.*, 371 F.Supp. 37, 44-45 [E.D. New York 1974]). Ultimately,                     acknowledged at trial that it had only substantially complied. [84] However, "for the purpose of fending off a contempt adjudication, partial or even substantial compliance with a court order is not obedience to it." *See, Vacco v. Consalvo*, 176 Misc.2d 107 at 115 (Bronx Co. Sup. Ct. 1998) (*citing Kuriansky v. Azam*, 575 N.Y.S.2d 679 [2ⁿᵈ Dept. 1991]).

Arguably, some of the violations, standing alone, would not constitute willfulness. However, examining the record as a whole, there, can be no doubt that                     's failures amount to willful disobedience. Despite clear warnings, the Company missed deadline after

---

[84] See Trial Transcript starting at page 59 line 19 through page 60 line 1.

deadline, never moving to quash subpoenas and never seeking Court intervention. Some subpoenas went largely ignored and another was ignored entirely - until this Court's intervention on July 30, 2021. The People repeatedly asked this Court to impose sanctions for non-compliance, at one point seeking "coercive sanctions" of $60,000 per day and at another time, asking the Court to find that ████████ had testified falsely. Each time, this Court demonstrated restraint. Choosing instead to admonish and warn ████████████ inviting it countless times to move to quash or seek this Court's intervention if it believed it appropriate.

████████████████ expertly produced a steady stream of responsive documents. Just enough to fend off the People's repeated requests for sanctions while never fully meeting any of the deadlines. When challenged, ████████ provided one excuse after another. At times it claimed it was impossible to meet deadlines because the demands were too voluminous, overbroad or vague. On other occasions, it blamed delays and omissions on human error. Ultimately, it blamed a "migration issue" for its failure to turn over 505 documents related to ████████ and the ████████ email. Further, by ████████████ s own admission, the completeness of every single document production was called into question by the migration issue and *every single search* had to be rerun. It goes without saying that the Certificate of Compliance signed by ████ ████ on August 17, 2021 was illusory. The claimed migration issue is simply inexcusable in this context and this Court must draw the inference that it was a willful attempt to withhold records.

Although a finding of criminal contempt does not require the movant to establish prejudice "since the right of the private parties to the litigation is not the controlling factor." *See, Matter of Environmental Protection of City of New York* at 239-240. Here, the missing records did indeed prejudice the Grand Jury investigation. Documents dealing with among other things, ████████████ ████ and ████████ which go to ████████████████████ were frequently withheld. In another example, documents necessary to prepare and examine a witness in the grand

jury were not turned over until three days after her testimony in direct violation of this Court's directive.

Despite this Court's demonstrated restraint and repeated efforts to resolve these discovery disputes without invoking sanctions, there comes a time when a court must enforce its authority. In this matter, that time is now. Criminal contempt "involves an offense against judicial authority and it is utilized to protect the integrity of the judicial process and to compel respect for its mandates...[u]nlike civil contempt, the aim in a criminal contempt proceeding is solely to punish the contemnor for disobeying a court order." *See, In the Matter of Environmental Protection of City of New York v. Department of Environmental Conservation of the State of New York,* 70 N.Y.2d 233, 239 (1987) *(citing King v. Barnes,* 113 NY 476 [1889]; *State of New York v. Unique Ideas,* 44 N.Y.2d 345 [1978]).

For the foregoing reasons, this Court finds the People have met their burden as to all four counts and this Court must now "compel respect for its mandates," to "protect the integrity" of the Grand Jury investigation.

**Wherefore,** this Court finds:

1. Respondent in criminal contempt of this Court for willful failure to comply with subpoenas *duces tecum* issued by the Grand Jury on March 22, 2021, April 23, 2021, May 21, 2021 and June 7, 2021;

2. Respondent in criminal contempt of this Court for willful failure to comply with the Court's Interim Order dated July 30, 2021, as modified by the Court's letter of August 6, 2021;

3. Respondent in criminal contempt of this Court for its willful failure to comply with the Court's Order issued on the record on August 10, 2021;

4. Respondent in criminal contempt of this Court for its willful failure to comply with the Court's Order issued on the record on August 24, 2021; and it is hereby

27

**ORDERED,** that Respondent must pay a fine of $1,000 pursuant to §§750(A)(3) and 751(1)

of the Judiciary Law for each of the four findings of criminal contempt; and it is further

**ORDERED**, that _____ is to remit payment of $4,000 to the County

Treasurer on a date certain to be determined after a conference with the Parties; and it is further

**ORDERED** that this Decision and Order shall remain sealed pursuant to CPL section

190.50(7) until further Order of this Court.

Dated: December 8, 2021
        New York, New York

ENTERED,

Hon. Juan M. Merchan
Acting Justice - Supreme Court
Judge - Court of Claims

28